UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DWAYNE JOHNSON, | : |
| Plaintiff, | : |
| | : CIVIL NO. 3:CV-05-2614 |
| v. | : |
| | : (JUDGE VANASKIE) |
| A. SMITH, ET AL., | : |
| Defendants. | : |

**M E M O R A N D U M**

I.  **Introduction**

Plaintiff, Dwayne Johnson, a state inmate currently housed at the Graterford Correctional Institution ("SCI-Graterford"), Graterford, Pennsylvania, commenced this pro se action with a civil rights complaint filed pursuant to the provisions of 42 U.S.C. § 1983. The incidents giving raise to this action occurred while Johnson was incarcerated at SCI-Huntingdon in late 2003. Johnson claims that SCI-Huntingdon staff retaliated against him for filing institutional grievances against staff members by: (1) placing him in the Restricted Housing Unit ("RHU") in Administrative Custody ("AC") under false pretenses and without adequate due process; (2) issuing a false misconduct report against him; and (3) transferring him from SCI-Huntingdon to SCI-Graterford.  (Dkt. Entry 1, Complaint.)  Plaintiff also asserts Defendants retaliated against him for asserting his First Amendment right to free exercise of religion.

Johnson seeks the removal of false security information from his file, as well as compensatory and punitive damages. (Id.) Named as defendants are the following SCI-Huntingdon and state Department of Corrections ("DOC") employees: James Grace, Superintendent; Security Lieutenant A. Smith; Security Captain Cooper; and, Donald Williamson, former Coordinator of Diagnostics and Classification for the Bureau of Inmate Services.[1]

Presently pending are cross motions for summary judgment. For the reasons that follow, the Defendants' Motion for Summary Judgment will be granted, and Plaintiff's motion will be denied.

## II.     Statement of Facts

In September of 2003, Johnson was housed at SCI-Huntingdon. Plaintiff served as a liaison between the SCI-Huntingdon Islam inmates and the administration in the Chaplain's office. (Dkt. Entry 1, Complaint.) Plaintiff's job often required him to work in the Chaplain's office. During the time that he worked in the Chaplain's office, his cell was searched twice a month. Plaintiff asked Rev. Earlston why his cell always being searched. Rev. Earlston told Johnson that any inmate who works in the Chaplain's office had their cells searched. (Id.)

On September 30, 2003, an investigative search of Plaintiff's cell was conducted by Corrections Officers Kurtz and Longenecker (non-defendants). (Id.) Because the officers

---

[1] Mr. Williamson is presently the Chief of Transfer/Transportation and Records for the Department of Corrections ("DOC").

failed to complete their search on that day, it was completed the following day.  (Id.)  On October 7, 2003, Johnson submitted two grievances against Kurtz and Longenecker, asserting claims of retaliation and unlawful taking of personal property.  (See Dkt. Entry 13, Defendants' Appendix in Support of their Motion of Summary Judgment, Exh. 1, Zamorski Decl., Exhs. A - B, grievances 64362 and 64363.)[2]

On Friday, December 25, 2003, Plaintiff "addressed his religious community at their approved scheduled religious activity concerning their complaints and how they are being address (sic) by the administrative staff."  (Complaint at ¶ 15.)  On December 29, 2003, pursuant to DC-ADM 802, Administrative Custody Procedures, Lt. A. Smith submitted "Other Report" No. A597194, requesting Johnson's placement in RHU under AC status.  (Dkt. Entry 13, Exh. 2, Smith Decl., Exh. A, Other Report No. A597194; and Exh. C, DC-ADM 802.)  He requested Johnson's RHU placement while he conducted an investigation concerning information received by the Security Office that Plaintiff was attempting to undermine Imam Muhammad, an individual with whom SCI-Huntingdon contracted to provide religious services. (Dkt. Entry 13, Exh. 2, Smith Decl. at ¶¶ 1-5; Exh. A, Other Report No. A597194,  and Exh. C, DC-ADM 802, Administrative Custody Procedures, ("DC-ADM 802").)

---

[2] The Secretary's Office of Inmate Grievance and Appeals ("SOIGA") returned Plaintiff's appeal of both grievances because he failed to provide required documents.  Johnson was given the opportunity to correct this shortcoming in his papers, but failed to do so.  (Id., Exh. C, SOIGA's January 6, 2004, letter to Johnson.)

On December 29, 2003, COs Kurtz and Longenecker removed Johnson from his general population cell and transferred him to the RHU, where he was placed in AC. (Complaint at ¶¶ 16 - 17.)   Johnson was given a copy of Other Report No. A597194 on December 30, 2003.  (Dkt. Entry 13, Exh. 2, Smith Decl., Exh. A, Other Report No. A597194.)

Later that day, Johnson was issued Misconduct No. A580169 by CO Longenecker, who charged Johnson with possession of contraband and destroying, altering, tampering with or damaging property.  (Doc. 17, Plaintiff's Affidavit of Truth in Opposition to Defendants' Motion for Summary Judgment, Exh. C, Misconduct Report No. A580169.) Johnson was accused of having "one cassette tape with forged tape requests, 2 books – property of another inmate/stolen, and 2 religious magazines mailed to chaplain of which the chaplains name was crossed off by Johnson.  The cassette tape was physically altered as well as dubbed over with rap music." (Id.)  Both charges are Class I category offenses.  (Id.; see also www.cor.state.pa.us, DOC Policies, DC-ADM 801, Inmate Discipline.)

On or about January 7, 2004, Johnson asked Unit Manager Walters, who is also a member of the Program Review Committee ("PRC"), why he was being held in the RHU on AC status.  (Complaint at ¶ 21.)  Johnson also wrote to Walters, seeking the same information. (Dkt. Entry 21, Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment, Exh. A, Plaintiff's 01/07/04 Request Walters.)  On both occasions, Walters responded that "all the information that PRC had available was [Johnson's] initial other report," and that "[Johnson's]

future should be important enough [for him] to make an inquiry to the security department.  It can't hurt."  (Id.)

Johnson alleges that on January 8, 2004, he was given a false misconduct, bearing No. A597197.  (Complaint at ¶ 24; see also Dkt. Entry 15-4, Plaintiff's Affidavit of Truth in Support of Complaint, Exh. C, DC-141 Part I No. A597197.)  Under the section identified as "MISCONDUCT CHARGE OR OTHER ACTION," is written "Class I #17 Threatening an Employee."  (Dkt. Entry 15-4, DC-141 Part I No. A597197.)  The unsigned, undated report notes that as a result of a search of Johnson's cell, Plaintiff was

> found to have in his possession a handwritten note labeled synthetic and natural.  On the back of the page anti-freeze is listed as a subject.  Inmate Johnson writes, 'Antifreeze is sweet tasting and if you mix it with salad dressing it will be undetected.' He ends the paragraph with, 'This should get the job done.' It is the Security Office's opinion Inmate Johnson took the time to write and save this bit of information in order to use it against staff or inmates.  An Auto School is located within the confines of SCI-Huntingdon, which, on occasion, handles anti-freeze.  Because of this fact it would be very easy for inmate Johnson to obtain anti-freeze.  If you combine the factors involved, it is very clear inmate Johnson is threatening both staff and inmates, otherwise he would not have written and saved this document.

(Id.) The reporting staff member's signature line is blank, as is the signature line for the reviewing and approving ranking officer.  Similarly, none of the boxes on top of the multipurpose DC-141 form, which are used to indicate whether it is to be used as a "misconduct report," "other" report, or "DC-ADM 801 Informal Resolution," are checked.  Johnson claims his

misconduct hearing on this matter was conducted less than 24 hours after his receipt of the report. (Complaint at ¶ 25.) According to Johnson, the "misconduct" was dismissed without prejudice. (Id.)

Pursuant to DC-ADM 802, AC confinement for investigative purposes shall not exceed 15-calendar days. Furthermore,

> The Facility Manager may approve one 15-calendar day continuation of the confinement, if the investigation has not been completed. The reason for the continuation shall be documented and a copy provided to the inmate. Following the 30-calendar day period, if the inmate remains in AC status, he/she must be charged with a misconduct and a hearing held within seven workdays, excluding weekends and State holidays. If the investigation indicates that a security concern ... exists, but the evidence is not sufficient for a misconduct, the inmate may be scheduled for a hearing to determine if further AC placement is necessary, upon expiration of the 30-calendar days.

See Dkt. Entry 13, Exh. 2, Smith Decl., Exh. C, DC-ADM 802, VI. Procedures, B. Administrative Hearing, 4.

On January 9, 2004, Lt. Smith filed a second "Other Report," No. A597199, requesting Johnson's AC placement be continued. The rationale given by Lt. Smith was that "[Johnson] is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation." (Dkt. Entry 13, Exh. 2, Smith Decl., Exh. B, Other Report No. A597199.) Plaintiff was issued a copy of this report the same day. (Id.)

On January 14, 2004, Plaintiff submitted grievance no. 72957 against Lt. Smith for his alleged retaliatory actions.  Although the grievance was assigned to Capt. Cooper, Lt. Smith's supervisor, Lt. Smith answered it.  (Id. at ¶ 29.)

Lt. Smith's investigation ultimately revealed that Johnson was in possession of documents that Lt. Smith believed indicated an attempt to undermine the contract Imam.  ((Dkt. Entry 13, Exh. 2, Smith Decl. at ¶ 8.)  In support of his assertion, Lt. Smith provided two letters written by Johnson to Imam Mohammad, and a Request Slip to Chaplain Koharchik.  (Id., Smith Decl., Exhibits D, E and F.)   He also submitted a typed, unsigned memo, ostensibly from the contract Imam to the institution's Security Captain, Mr. Cooper, asking that correctional officers stop searching Muslim inmates going to the dining hall during the month of Ramadan.  (Id., at Exh. G.  Additionally, Lt. Smith stated that Johnson was in possession "of a handwritten note explaining how to poison people by adding antifreeze to salad dressing and that he was in the process of planning to introduce such a substance into the salad dressing in the officer's dining room."  (Id., Smith Decl. at ¶ 9.)  Lt. Smith took the note seriously, as SCI-Huntingdon has an automotive shop where antifreeze could potentially be acquired.  (Id. at ¶ 10.)  In Lt. Smith's professional judgment, Johnson's continued presence at SCI-Huntingdon "constituted a very real security threat to the contract Imam, other clergy at the institution and targets of a potential poisoning attempt."  (Id. at ¶ 11).  Lt. Smith believed "these threats were obviated first by placing Mr. Johnson in the RHU until [his] investigation was completed and then by transferring

-7-

him to a different institution." (Id. at 12.)

On January 15, 2004, Johnson wrote to Donald Williamson, then Coordinator of Diagnostics and Classification for the Bureau of Inmate Services, asserting claims of retaliation and staff misconduct. (Complaint at ¶ 28.) The same day, SCI-Huntingdon's PRC,[3] in accordance with DC-ADM 802, continued Johnson's AC status on the ground that he was "a danger to some person(s) in the institution who cannot be protected by alternative measures. Specifically, separation needs exist." (Dkt. Entry 13, Exh. 1, Zamorski Decl., Exh. D, DC-141 Part III, PRC Action sheet of 01/14/04.) In response to Johnson's inquiry as to why he was being held in the RHU, and why he was being transferred, the PRC advised him it was "for security reasons." (Id.)

On January 28, 2004, Johnson wrote to Imam Muhammad, stating, in part, that "I am being held in the RHU because I am a threat to you or Father Koharchik," and that he needed the Imam "to make a statement concerning this matter." (Dkt. Entry 17, Affidavit of Truth in Opposition to Defendants Motion for Summary Judgment, Exh. B, Johnson's 01/28/04 Request to Imam Mohammad.) The Imam responded that he has "not had any problems, of any kind, with [Plaintiff]. As such, [he] ha[s] asked NO one to take any action against you." (Id.)(emphasis in original).

---

[3] The PRC that day consisted of Ogershok and Lawler (non-defendants) as well as defendant Williamson.

-8-

On February 6, 2004, defendant Williamson reviewed William Walters' (non-defendant) requested to transfer Johnson. (Dkt. Entry 13, Exh. 3, Williamson Decl. at ¶ 5.) The transfer request was premised upon: (1) Johnson's attempts to undermine the contract Imam at SCI-Huntingdon; (2) Johnson's possession of notes on how to contaminate salad dressing; and (3) Johnson's accumulation of 24 Class I Misconducts since his re-entry into the state prison system in 1986. (Id. at ¶ 6.) Williamson approved the transfer request on February 9, 2004. (Id. at ¶ 5.) Williamson's decision to grant the transfer request "was in no way related to [Johnson's] religious beliefs or the fact that he utilized the Inmate Grievance System." (Id. at ¶ 7.) Johnson was transferred from SCI-Huntingdon to SCI-Graterford on February 17, 2004. (Id. at ¶ 8.)

In his Complaint, Johnson alleges Capt. Cooper "personally participated" in violating his civil rights by approving Lt. Smith's cell searches, using false information to place him in the RHU, and approving his transfer. (Complaint at ¶ 31.) Superintendent Grace is named as a defendant for signing the vote sheet recommending Plaintiff's transfer after he was aware that the request was retaliatory and based on false information. (Id. at ¶ 32.) Donald Williamson is also named for approving Plaintiff's transfer after Johnson alerted him to the staff's retaliatory motives. (Id. at ¶ 33.) Additionally, Plaintiff states that while housed in AC, he was denied access to rehabilitative programs, suffered reduced telephone privileges, had inadequate access to legal research materials, and reduced access to religious activities and

-9-

commissary. (Id. at ¶ 34.) Plaintiff further avers that, as a result of his transfer to SCI-Graterford, he is further from his family, received a pay cut, and was held on AC based on the false information placed in his file by SCI-Huntingdon's Security Office. He also asserts that he was classified as a high security concern, precluding him from obtaining certain institutional jobs and impairing his prospects for parole. (Id. at ¶ 35.)

### III.    Standard of Review

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). In considering a summary judgment motion, inferences from the underlying facts must be viewed in the light most favorable to the non-moving party. P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006).

Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the burden then shifts to the non-moving party. The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading." Saldana, 260 F.3d at 232. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must "set

-10-

forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Issues of fact are "genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. Id.  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  Allegations made without any evidentiary support may be disregarded. Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000).  Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 5887(citations omitted).

**IV.    Discussion**

    **A.    Johnson's Retaliation Claim.**

To establish a Section 1983 retaliation claim, a plaintiff bears the burden of satisfying three elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied upon showing a causal link between the exercise of a protected right and adverse action taken by a prison official "'sufficient to deter a person of ordinary firmness from exercising his First

-11-

Amendment rights.'" Id. at 333 (quoting Allah, 229 F.3d at 225). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." Id. at 333-34 (quoting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000). The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. See Lape v. Pennsylvania, 157 Fed. Appx. 491, 498 (3d Cir. 2005)(citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).

Only where the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, standing alone, support an inference of causation. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)(quoting Robinson, 120 F.3d at 1302). Once Plaintiff has made a prima facie case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (internal quotation and citation omitted). When analyzing a retaliation claim pursuant to the above, it must be recognized that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned. Rauser, 241 F.3d at 334.

Johnson alleges that he was placed in the RHU in retaliation for exercising his

First Amendment rights to file grievances and because of his religious activities. It is clear that the filing of prison grievances constitutes protected conduct that falls within the ambit of the First Amendment. See, e.g., Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir .2003); Allah, 229 F.3d at 224-25. That Johnson engaged in protected conduct cannot be reasonably disputed. It is also undisputed that Johnson's confinement in AC and subsequent transfer to SCI-Graterford could constitute "adverse actions" for the purpose of setting forth a retaliation claim. Id. What Plaintiff has not shown, however, is evidence sufficient to establish a causal link between the protected conduct and the alleged adverse action.

      Plaintiff was found in the possession of documents which the Security Office found suggestive of Plaintiff's attempts to undermine the contract Imam. Although Plaintiff notes that the Imam in question did not have a problem with Johnson, that statement does not imply that Imam Muhammad was aware of the content of the various documents found in Plaintiff's cell.

      Johnson's involvement with the Imam was not the only rationale relied upon by prison authorities for placing Johnson in AC. Additionally, documents found in Plaintiff's cell indicate that he was personally planning, instructing, directing or assisting others in methods to poison unidentified individuals by mixing antifreeze with salad dressing. The language of the notation, "This should get the job done," is particularly disturbing. Clearly Johnson does not have a constitutional right to poison, or plot to poison, anyone, and any efforts to undertake

such activity in a prison setting must be taken seriously. His transfer from the facility was further supported by the rationale that Plaintiff had acquired 24 Class I Misconducts since his re-entry into the prison system.[4]

To defeat summary judgment, Johnson bears the burden of identifying evidence from the record from which a reasonable jury could conclude that he was placed in AC in retaliation for his religious activities or for filing prison grievances. Johnson has not met his burden. Based on the record before me, other than his own supposition, Johnson cannot show a causal connection between his religious activities, or the filing of his grievances against Kurtz and Longenecker (which occurred more than two months prior to his RHU placement), and the Defendants' alleged retaliation against him. It is mere speculation on his part that he was placed in AC or transferred to another facility as a direct result of either his religious activities or institutional grievances.

Furthermore, Defendants have offered uncontradicted evidence that the same decision would have been made in the absence of the alleged retaliatory motives. Segregation

---

[4] While Plaintiff disputes the "true" nature or characterization of the 24 Class I misconducts he received, and the time frame in which he received them, he does not dispute that he has indeed accrued 24 such misconducts. (See Dkt. Entry 16, Plaintiff's Opposition to Defendants Motion for Summary Judgment, p. 5.) Furthermore, the Class I misconducts proffered by Plaintiff in support of his assertion that the misconducts were not as serious as their classification would suggest only underscore Johnson's propensity to challenge prison authority and incite others to do the same. (See Dkt. Entry 17, Affidavit of Truth in Opposition to Defendants Motion for Summary Judgment, Exh. D and E.)

and transfer are authorized and appropriate responses when security concerns arise. Given the materials found in Johnson's cell and his misconduct history, his segregation and transfer were clearly supported by legitimate penological objectives, and summary judgment is appropriate on these claims. See Carter, 292 F.3d at 154; McGrath v. Johnson, 155 F. Supp. 2d 294, 303-05 (E.D. Pa. 2001), aff'd, 35 Fed. Appx. 357 (3d Cir. 2002).

    **B.**    **Johnson's Placement in AC did not Violate his Due Process Rights.**

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall ...deprive any person of life, liberty, or property, without due process of law. . . ." In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next step is to define what process is mandated to protect it. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000). Inmates do not have a protected liberty interest in remaining in general population founded in either the United States Constitution or Pennsylvania law. See Sandin v. Conner, 515 U.S. 472, 486 (1995); Montanye v. Haymes, 427 U.S. 236, 242 (1976); Olim v. Wakinekona, 461 U.S. 238 (1983); and Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995).)

In Sandin, the Supreme Court established a "new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees." Shoats, 213 F.3d at 143. It held that due process requirements would only apply where the prison's actions impose "an atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483. Confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. Id. at 486. "The determination of what is 'atypical and significant' is based upon the range of conditions an inmate would reasonably expect to encounter." McKeithan v. Jones, 212 Fed. Appx. 129, 130 (3d Cir. 2007)(citing Asquith v. Dep't. of Corrections, 186 F.3d 407, 412 (3d Cir. 1999); Griffin v. Vaughn, 112 F.3d 703, 706 & n.2 (3d Cir. 1997)). Finally, an inmate placed in administrative custody pursuant to a legitimate penological reason could "be required to remain there as long as that need continues." Griffin, 112 F.3d at 709.

      The fact that Johnson was placed in AC prior for allegedly 72 hours prior to receiving written notice of the reasons for his placement may fall short of DC-ADM 802's procedures, but does not per se constitute a due process violation. See Elkin v. Fauver, 969 F.2d 48, 52 (3d Cir.1992); Flanagan v. Shively, 783 F. Supp. 922, 931 (M.D. Pa. 1992) ("The Constitution does not require strict adherence to administrative regulations and guidelines.") Johnson received notice of the investigative nature of his confinement at approximately 1:20 p.m. on December 30, 2003, 27 hours after his initial AC placement. His confinement was appropriately continued a week later via Lt. Smith's second "other" report request for the same. At the conclusion of Lt. Smith's investigation, when prison officials continued to have legitimate security concerns but the evidence was insufficient to support a misconduct, a PRC hearing

was promptly held.  The PRC determined that Johnson's further AC confinement was necessary for security reasons.  Johnson was alerted to those reasons, and given an opportunity to speak to them.

In any event, the conditions encountered by Johnson in AC were not so harsh or atypical as to trigger any due process safeguards.  To this end, Johnson complains that while in AC he was denied access to rehabilitative programs, reduced access to phone calls to his family, inadequate access to legal research materials, and reduced access to religious activities and commissary when compared to that which he enjoyed while housed in general population.  (Complaint at ¶ 34.)  However, the quantitative loss of privileges enjoyed prior to his AC placement does not create an "atypical deprivation" necessary to implicate a liberty interest triggering due process protections.

Although the conditions of segregated confinement may be significantly more austere than those enjoyed while in general population, "Sandin does not permit [a comparison of] the prisoner's own life before and after the alleged deprivation.  Rather, . . . the prisoner's liberties after the alleged deprivation [must be compared] with the normal incidents of prison life."  Asquith, 186 F.3d at 412.  Thus, Sandin instructs that the relevant inquiry is whether the conditions of administrative confinement are significantly more restrictive than those imposed upon other inmates in solitary confinement, or in this case, the RHU.  Shoats, 213 F.3d at 144 (citing Sandin, 515 U.S. at 486); see also Mitchell, 318 F.3d at 532.  Furthermore,

reclassification to a stricter housing unit and its coinciding loss of privileges "falls within the expected parameters of the sentence imposed by a Court of law." Sandin, 515 U.S. at 485. The conditions of Johnson's confinement are not alleged to be any different from others housed in the prison's RHU for administrative custody reasons.  Thus, Johnson has not alleged facts from which it may be inferred that his placement in AC imposed an "atypical and significant hardship" as defined in Sandin.

      It is thus clear that the predicate for a due process claim, a protected liberty interest, is absent here.  Plaintiff did not have a protected liberty interest in remaining free of administrative custody.  His limited AC confinement prior to his transfer to SCI-Graterford was not "atypical" in either its duration or degree of restriction.  Johnson's placement in AC custody did not implicate his Due Process rights.

**V.** **Conclusion**

For the reasons set forth above, Defendants are entitled to judgment in their favor.  An appropriate Order follows.

# UNITED STATES DISTRICT COURT
# FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DWAYNE JOHNSON,** | : |
| | : |
| **Plaintiff,** | : |
| | : **CIVIL NO. 3:CV-05-2614** |
| v. | : |
| | : **(JUDGE VANASKIE)** |
| **A. SMITH, ET AL.,** | : |
| | : |
| **Defendants.** | : |

# O R D E R

**NOW**, this **19th** day of **JULY, 2007,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Dkt. Entry 11) is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment (Dkt. Entry 20) is **DENIED**.

3. The Clerk of Court is directed to enter judgment in favor of all Defendants and to mark this matter **CLOSED.**

                                      **s/ Thomas I. Vanaskie**
                                      Thomas I. Vanaskie
                                      United States District Judge